*UNITED STATES DISTRICT COURT*
*DISTRICT OF MAINE*

| | |
|---|---|
| *UNITED STATES OF AMERICA* ) | |
| ) | |
| v. ) | *Docket No. 06-59-P-S* |
| ) | |
| *TIMOTHY PULK and ANGELA* ) | |
| *SARGENT,* ) | |
| ) | |
| *Defendants* ) | |

*RECOMMENDED DECISION ON MOTIONS TO SUPPRESS*

Defendant Timothy Pulk seeks to suppress "all evidence gained as the result of the seizure, search, and interrogation of Defendant" on December 15, 2005 in Lewiston, Maine. Motion to Suppress ("Pulk Motion") (Docket No. 85) at 1. Jointly, he and defendant Sargent challenge the sufficiency of the affidavit supporting a search warrant during the execution of which at their residence on December 12, 2005 Sargent made certain statements[1] to the officers executing the warrant.[2] Joint Motion to Suppress Evidence ("Joint Motion") (Docket No. 87). Pulk and Sargent are both charged with conspiracy to distribute, and to possess with intent to distribute, five kilograms or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846; conspiracy to conduct and attempt to conduct financial transactions involving the proceeds of unlawful activity, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) & (ii) and 1957; six counts of engaging, attempting to engage in, and aiding and abetting monetary transactions with property derived from unlawful activity, in violation of 18 U.S.C. §§ 1957 and 2; two counts of conducting and attempting to conduct a financial transaction involving the

---

[1] Neither the defendants nor the government identifies any evidence seized as a result of the search.
[2] At the hearing, Sargent withdrew that portion of the purportedly joint motion that sought suppression of the statements she made.
(*continued on next page*)

1

proceeds of an unlawful activity, and aiding and abetting the same, in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2; and conspiracy to evade the reporting requirements of 31 U.S.C. § 5313(a) by causing a financial institution to fail to file a required report, in violation of 18 U.S.C. § 371. Indictment (Docket No. 1) at 1-6. An evidentiary hearing was held before me on January 23, 2007 at which the defendants appeared with counsel. I now recommend that the following findings of fact be adopted and that the motions be denied.

## I. Proposed Findings of Fact

Paul Wolf, a special agent with the federal Drug Enforcement Agency ("DEA"), testified that he was involved in an investigation of the defendants when he received information from Sargent about Pulk's drug-related activities. She told Wolf how Pulk participated in the transportation of kilograms of cocaine from Texas to Maine and about boats, real estate and snowmobiles that had been purchased with money generated by drug-related activities. On December 12, 2005, while a search warrant was being executed at the defendants' home, Sargent described to Wolf five checks generated from the sale of a camp that had been held in the names of Pulk's parents but which belonged to him. The checks were each for the same amount, around $8,000, and were made out to her, although the money was not her property. The agents were anxious to find these checks because they knew the checks were subject to forfeiture because the camp that had been sold had been used to facilitate drug transactions. Sargent also showed the agents bruises on her legs and abdomen that she said had been inflicted by Pulk.

On December 15, 2005 Wolf and other agents were conducting surveillance at the Chalet Motel in Lewiston, Maine because they had received information that the defendants and their three children had rented adjoining rooms there. The agents saw Sargent and her children entering the

---

Counsel for Pulk agreed that his client lacked standing to join in this portion of the motion.

2

rooms and later leaving. They followed Sargent and her children who went directly to their home at 515 Middle Road in Sabattus, Maine. Wolf and Agent Boucher interviewed Sargent there in the driveway. When she was asked about the five checks, she said that she had one of them and handed it to Wolf. It was numbered 177121, made out to Angie Sargent in the amount of $8,200. A copy of this check is Government Exhibit 2. Sargent said that the other four checks were in Pulk's custody in the motel rooms. The agents knew that Pulk had recently been released from the hospital, where he had been treated for a drug overdose that had nearly been fatal. Sargent said that she had rented the motel rooms, that she was concerned for her safety and seeking protection from the government and that she wanted to get away from Pulk.

Wolf asked Sargent whether the agents could search the motel rooms for the checks and she agreed verbally. The agents then obtained her written consent to a search of the motel rooms. Government Exhibit 1 is the DEA Form 88 on which this consent is recorded. Wolf, three other agents and two Lewiston police officers then went to the Chalet Motel. Wolf drove to the rear of the motel and parked. As planned, two other agents went to the front desk to get a key for Room 309. Other agents were in position to watch the door of Room 309, a room on the third floor which, like all of the motel rooms, opened onto a balcony or walkway running along the exterior of the building. There are no interior hallways in the motel.

As Wolf approached the building, he saw Pulk walking quickly or running down the third-floor walkway from the area of Room 309 toward a stairway at the corner of the building. He followed Pulk to the corner, where Pulk was talking with DEA Agent Jack Daley. Pulk was wearing lightweight cotton pants, possibly pajama pants, with a loose cotton shirt and socks. It was approximately 2 or 3 p.m. and the temperature was below freezing. At the time, Wolf had been working on this case since March 2005 and was aware of a traffic stop in Louisiana within the past month in which four

3

kilograms of cocaine and a handgun had been seized from a Maine resident known to be an associate of Pulk; Sargent had told him that Pulk had been violent toward her; and Pulk had recently suffered a drug overdose. Wolf recognized Pulk from photographs that he had seen.

No weapons were drawn. Wolf stood near Pulk and told him, "We're the DEA. I need to talk to you. We're going to pat you down for weapons. Do you have anything that's going to hurt me?" Pulk responded, "I don't have any weapons. All I have is these checks." He pulled four folded checks from the breast pocket of his shirt and handed them to Wolf, who looked at the checks and saw that they were nearly identical to the one Sargent had given him. The checks were numbered sequentially, beginning with 177122, were each made out to Angie Sargent and were each in the amount of $8,200. Government Exhibit 4 is a copy of the checks.

Wolf then asked Pulk if he would be more comfortable if they moved indoors before he asked his questions. Pulk agreed to go inside Room 309. Before Pulk entered, some of the agents conducted a security sweep of the rooms and may have had their weapons drawn during the sweep. Nothing of significance was found in the search of the rooms. Wolf talked with Pulk inside the room for ten to fifteen minutes. Wolf explained Pulk's status and made it clear that Pulk was not under arrest and did not have to answer any questions, that it was Pulk's option whether to talk or not, and that he could talk about whatever he wished or nothing at all. Pulk said that he understood. Pulk was not given a *Miranda* warning. Pulk was free to leave at any time.

Pulk talked about his business, Downeast Home Improvement. He talked about the sale of the camp and the checks that had been seized, but declined to answer, when asked, why the camp had been sold in the names of his parents with the proceeds in Sargent's name. When asked why the proceeds had been put into five sequential checks in identical amounts below the federal transaction reporting level rather than a single check, Pulk responded, "That's just the way my father did it." He then said

4

that he did not want to talk any more and asked the agents to contact his attorney. The agents gave Pulk their contact information and left him in the motel room. Wolf had not previously been aware that Pulk had an attorney.

Pulk may have asked that the checks be returned to him and Wolf may have said in response that the checks were made out to Angela Sargent, asking, "Are you Angela Sargent?"

## II. Discussion

### A. The Search Warrant

The defendants assert that "[t]he affidavit for search warrant contains no information from which the complaint justice was justified in finding probable cause." Joint Motion at [6].[3] They specifically attack paragraphs 3-8 of that affidavit. *Id*. at [6]-[8]. This argument is an apparent reference to the principle of criminal case law that "an affidavit serving as the basis for issuance of a search warrant is sufficient when it demonstrates in some trustworthy fashion the likelihood that an offense has been committed and that there is sound reason to believe that a particular search will turn up evidence of it." *United States v. Spinosa*, 982 F.2d 620, 625-26 (1st Cir. 1992) (citations and internal quotation marks omitted). "[P]robable cause to issue a search warrant exists when given all the circumstances set forth in the affidavit there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Procopio*, 88 F.3d 21, 25 (1st Cir. 1996) (citation and internal punctuation omitted). The court must consider the totality of the circumstances set forth in the affidavit and determine whether the affidavit establishes a substantial basis upon which to conclude that there is such a fair probability. *United States v. Khounsavanh*, 113 F.3d 279, 283 (1st Cir. 1997).

---

[3] Counsel is reminded that Local Rule 147(e) requires all pages of memoranda of law to be numbered at the bottom.

5

As the government points out, Government's Objection to Defendants Timothy Pulk and Angela Sargent's Motion to Suppress ("Joint Opposition") (Docket No. 105) at 8, the defendants' motion fails to mention paragraph 11 of the affidavit presented to the court in support of the application for the search warrant at issue. The government takes the position that the information in that paragraph alone is sufficient to justify the issuance of the search warrant. *Id*. I agree. That paragraph provides:

> On 12-11-2005 at approximately 9:00 a.m., Androscoggin County 911 Center received a call from Thomas Blancato. In summary[,] Blancato stated that he was at 515 Middle Rd, Sabattus, ME and his friend was unresponsive and he needed help. Officer Lee O'Connor of the Sabattus, ME Police Department as well as United Ambulance Paramedics arrived at 515 Middle Rd, Sabattus, ME[,] the residence of Tim Pulk and Angela Sargent. Upon arrival at the residence Officer O'Connor spoke with Blancato. Blancato stated that Pulk has been using OxyContin, methadone, Xanax, paxil, alcohol and cocaine. Blancato handed Officer O'Connor a handful of pills to include methadone, Oxycontin and Xanax[.] [N]one of the residents in the house had a valid prescription for the pharmaceutical drugs. Pulk was transported to Central Maine Medical Center where he is listed in critical condition.

Statement of Task Force Agent Gregory Boucher (attached to Affidavit and Request for Search Warrant (Government Exhibit 5)), ¶ 11.

This paragraph alone establishes probable cause that contraband — scheduled drugs for which none of the residents had a prescription — would be found in the residence and that a crime — possession of scheduled drugs, a violation of 17-A M.R.S.A. § 1107-A — had been committed. The information is not stale; the application was made the day after the events reported. Affidavit and Request for Search Warrant at 2. The material subject to the requested warrant was described as "[s]cheduled drugs, including but not limited to cocaine; drug paraphernalia" and other items related to possession, furnishing or trafficking in scheduled drugs. *Id*. at 1. These items are logically within the scope of the information provided in paragraph 11. The motion to suppress should be denied on the basis of paragraph 11 of the affidavit alone.

Even if that were not the case, the defendants' attack on paragraphs 3-8 of the affidavit would not succeed. They contend that these paragraphs do not present sufficient information to allow the court to determine whether the statements of informants reported in those paragraphs are reliable and that "most of the information is stale" because it was received nine or more months before the application was made. Joint Motion at [8]-[9]. "When an affidavit relies upon the credibility of informants to demonstrate probable cause for the issuance of a warrant the informants' credibility can be established in multiple ways." *United States v. Fournier*, 2002 WL 31414112 (D. Me. Oct. 23, 2002), at *1. Any and all of the following factors may be considered:

> 1. Consistency among independent reports.
> 2. Declarations against penal interest.
> 3. Consistency with information provided by "ordinary citizens" (such as complaints by neighbors that an individual was cultivating marijuana) — a type of report that enjoys special stature since information provided by ordinary citizens has particular value in the probable cause equation.
> 4. Corroboration by external data.
> 5. Self-authentication through specificity and detail.

*Id*. at *1-*2 (citation and internal punctuation omitted). When these factors are considered, "an informant's tip can establish probable cause even though the affidavit does not contain information about the informant's past reliability." *United States v. Greenburg*, 410 F.3d 63, 67 (1st Cir. 2005).

Here, paragraphs 3-8 of the affidavit state that (i) an anonymous caller to the Maine Drug Enforcement Agency hotline on March 30, 2005 stated that Pulk and Adam Pesce were dealing large quantities of cocaine from Pulk's residence and that the cocaine came from Texas; (ii) an anonymous source stated on April 16, 2005 that Pesce was selling cocaine and crack cocaine; (iii) Pesce was arrested on October 21, 2005 in Shreveport, Louisiana, having started the trip in Cypress, Texas, while in possession of ten pounds of cocaine; (iv) informant CI-1, who had proven to be reliable in several ongoing drug-related investigations and whose cooperation had led to several arrests, reported on December 8, 2005 that a known distributor of cocaine for Pulk had recently told him that Pesce had

7

gone to Texas to get a large amount of cocaine for Pulk, that Pesce was arrested while coming back from Texas with the drug and that Pulk had hired an attorney for Pesce; (v) informant CI-2, who had proven to be reliable in ongoing drug-related investigations, stated on October 31, 2005, based on personal knowledge, that Pulk distributed kilo quantities of cocaine, that Pesce dealt cocaine for Pulk, that CI-2 had provided transportation to numerous drug dealers including Pesce, that on several occasions CI-2 observed Pesce coming out of Pulk's residence, that Daniel Boone sold cocaine that he got from Pulk at this residence, that Pulk grew marijuana behind his barn and in nearby woods and that Pulk gave Gerry Arsenault $90,000 to purchase several kilos of cocaine from Pulk's source of supply; and (vi) informant CI-3, who had proven to be reliable in several investigations with cooperation leading to several drug-related arrests, had advised MDEA agents on March 16, 2005 that CI-3 had purchased cocaine from Pulk and had seen Pulk hide cocaine in a safe in the floor of his residence under another safe in a closet in an office at the back of the house. Statement of Task Force Agent Gregory Boucher ¶¶ 3-8. These independent reports demonstrate consistency; some include statements against penal interest; and some are self-authenticating through specificity and detail. Considered as a whole, these paragraphs of the affidavit are also sufficient to establish the credibility of the informants.

With respect to the claim of staleness, so long as there is contemporaneous and relevant information in the affidavit, other information up to a year old is not too old to be considered in evaluating probable cause. *United States v. Reiner*, 382 F.Supp.2d 195, 198-99 (D. Me. 2005). The affidavit provides probable cause for the issuance of the search warrant. *See generally United States v. Friel*, 448 F.Supp.2d 222, 226-27 (D. Me. 2006).

The joint motion to suppress should be denied for these reasons as well. It is accordingly unnecessary to address the government's additional argument that the officers executing the search

warrant had an objectively reasonable belief that their conduct did not violate the Fourth Amendment. Joint Opposition at 9-10.

## B. The Events at the Motel

Pulk seeks to suppress "all evidence gained as the result of the seizure, search, and interrogation of Defendant" on December 15, 2006 at the Chalet Motel. Pulk Motion at 1. He contends that "[c]hecks seized . . . should be suppressed as beyond the scope of a pat down search;" "[c]ontinued detention and questioning was either beyond the scope of lawful detention" or "had become an arrest, requiring the giving of Miranda warnings." *Id*. at 2. He also suggests that his initial detention was unlawful. *Id*. Pulk's counsel argued at the close of the evidentiary hearing that the testimony of Agent Wolf, the only witness to testify at the hearing, was inherently incredible; that the agents had "no independent basis to know whether [Pulk] had the checks on him," there was no evidence of criminal wrongdoing, the agents had no basis to seize or search him on the balcony, the agents had no fear or apprehension that he had any weapons and that the pat down search was thus unjustified, that the agents seized him without reasonable suspicion and that his detention in the motel room in the presence of six agents constituted a *de facto* arrest.

I reject the defendant's contention that Agent Wolf's testimony was inherently incredible. There is no evidence in the record that even suggests any basis for such a conclusion. Because I credit Agent Wolf's testimony that Pulk took the checks out of his pocket and handed them to Wolf, I do not consider further any of the defendant's arguments about the pat down search, which, from all that appears in the record, did not generate any evidence.[4] The agents had the statements of Sargent as "independent evidence" that Pulk was in possession of the checks. Her statements had also provided

---

[4] As the government notes, Government's Objection to Defendant Timothy Pulk's Motion to Suppress ("Pulk Opposition") (Docket No. 106) at 3, Pulk cannot argue that he had the necessary reasonable expectation of privacy in the checks or the pocket in which he was carrying them when he voluntarily offered them to Wolf. *See United States v. Dunning*, 312 F.3d 528, 531 (1st Cir. 2002).

9

the agents with evidence of criminal wrongdoing by Pulk, and the affidavit of Agent Boucher, dated three days before the events at the motel, also demonstrates that the agents had evidence of criminal activity by Pulk.

A law enforcement officer may, under certain circumstances, approach a person and conduct an investigation into possible criminal behavior even though there may not be probable cause to make an arrest. *Terry v. Ohio*, 392 U.S. 1, 20-23 (1968). A *Terry* stop is justified if the officer can point to specific and articulable facts "which, taken together with rational inferences from those facts, reasonably warrant" the stop. *United States v. Romain*, 393 F.3d 63, 71 (1st Cir. 2004) (citation omitted). Here, the agents were justified in stopping Pulk on the walkway given what they knew and what they had observed at the time. There was no seizure under the circumstances. Pulk was told that he did not have to answer the agents' questions and could leave at any time. He was invited to go back into the motel room for his own comfort and that of the agents, given the weather conditions.

Nor was a *Miranda* warning required under the circumstances. Such a warning is required only in the case of a custodial interrogation. *Berkemer v. McCarty*, 468 U.S. 420, 434 (1984). This *Terry* stop was neither unduly prolonged nor especially restrictive. *See United States v. Teemer*, 394 F.3d 59, 65-66 (1st Cir. 2005). Pulk was questioned for ten to fifteen minutes; he was told that he need not answer any questions and was free to leave. When he stated that he would answer no more questions and referred the agents to his lawyer, the agents left. There was no custodial interrogation. *See United States v. Ventura*, 85 F.3d 708, 710-12 (1st Cir. 1996). Pulk's motion to suppress should be denied.

This conclusion makes it unnecessary to consider the government's alternative argument that the checks would inevitably have been discovered. Pulk Opposition at 6-7.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and the defendants' motions to suppress (Docket Nos. 85 and 87) be **DENIED.**

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum, within ten (10) days after being served with a copy thereof. A responsive memorandum shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 24th day of January, 2007.

/s/ David M. Cohen
David M. Cohen
United States Magistrate Judge